# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

SUSAN MICHAEL, on behalf of herself )
and on behalf of all others similarly situated, )
                           )
            Plaintiff, )
        v. )     Case No. 16 CV 07238
                           )
CITIMORTGAGE, INC. and SAFEGUARD )    Judge Amy J. St. Eve
PROPERTIES MANAGEMENT, LLC, )    Magistrate Judge Jeffrey T. Gilbert
                           )
            Defendants. )

## PLAINTIFF'S RESPONSE TO CITIMORTGAGE, INC.'S MEMORANDUM OF LAW

Now comes Plaintiff SUSAN MICHAEL, on behalf of herself and on behalf of others

similarly situated, by and through her below-signed counsel, and in response to the memorandum

of law in support of CITIMORTGAGE, INC.'s ("Citi" or "Defendant") motion to dismiss or,

alternatively, strike Plaintiff's class allegations ("motion to dismiss"), states as follows:

### Introduction

The Defendant has moved to dismiss Plaintiff's amended class action complaint, which

challenges default-related service fees that Citi charged for drive-by property inspections of

borrowers' homes. Plaintiff's lawsuit is similar to a class action filed against Wells Fargo & Co.

in the Northern District of California and transferred to the Southern District of Iowa. In that

case,[1] brought under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), the

plaintiffs alleged that Wells Fargo utilized a computer system to order monthly drive-by property

inspections once a borrower was in default, affording scant opportunity to determine whether the

lender's interest was truly at risk. The court (1) held that the plaintiffs stated a claim under

RICO, *Young v. Wells Fargo & Co.*, 671 F.Supp.2d 1006 (S.D. Iowa 2009) ("*Huyer I*"); granted

---

[1] *Huyer v. Wells Fargo & Co,* no. 4:08-cv-00507 (S.D. Iowa), formerly captioned *Young v. Wells Fargo & Co.* For sake of convenience, the case will be generally referred to as *Huyer*.

class certification, *Huyer v. Wells Fargo & Co.*, 295 F.R.D. 332 (S.D. Iowa 2013) ("*Huyer II*"); and entered judgment in settlement of the class claims along with an award of attorney fees, *Huyer v. Wells Fargo & Co.*, no. 4:08-cv-00507 (S.D. Iowa Feb. 17, 2016) ("*Huyer III*"). Plaintiff's complaint contains fifty or sixty allegations that are substantially similar to those in *Huyer*, both cases setting forth a scheme to defraud with a myriad of common elements.

As shall be demonstrated, Plaintiff has adequately alleged causes of action under RICO, for breach of contract, violation of the Consumer Fraud Act, and other matters. Defendant's reliance upon *Stitt v. Citibank, N.A.* – in which the court went so far as to distinguish *Huyer* on the basis of its RICO allegations, having previously dismissed the *Stitt* plaintiffs' RICO claim despite the "very similar" conduct of the defendants in the two cases[2] – cannot camouflage the substantive congruence of Plaintiff's causes of action and class allegations. Defendant's motion to dismiss should be denied.

## GENERAL STANDARDS OF LAW

Under Rule 12(b)(6), the court accepts as true all well-pleaded facts and draws all reasonable inferences in the plaintiff's favor. *Anchor Bank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Fraud-based allegations, such as allegations of fraud in a RICO complaint, must satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 726 (7th Cir. 1998). This requires describing

---

[2] *See Stitt v. Citibank, N.A.*, 2015 WL 75237 (N.D. Cal. Jan. 6, 2015) ("*Stitt II*") at *7 and *Stitt v. Citibank, N.A.*, 2015 WL 9177662 (N.D. Cal. Dec. 17, 2015) ("*Stitt III*") at *6.

the predicate acts with some specificity and stating the time, place and content of alleged communications that perpetrated the fraud. *Id.*

## I. Plaintiff Complied with the Notice-and-Cure Requirement of her Mortgage.

Plaintiff complied with the notice-and-cure requirement in Paragraph 20 of her mortgage. Attached as Exhibit A is Plaintiff's affidavit setting forth the factual details of the mailed notice that was afforded to Citi approximately three months prior to the action being filed. Attached thereto, incorporated by reference therein, is a copy of the letter that was sent to Citi by the Plaintiff on May 11, 2016. (Affidavit of Susan Michael, Ex. A, ¶¶ 10-14). No response from Citi was ever received by the Plaintiff. (Michael Affidavit, ¶13). The three months that ensued between mailing the letter and filing this action amounted to a reasonable period in which Citi could have taken corrective action to forestall or obviate this litigation. Plaintiff relied upon her May 11, 2016 letter in concluding that she had satisfied the notice-and-cure requirement of her mortgage. (Michael Affidavit, ¶15).

Attached as Exhibit B is a facsimile of Citi's Licensing and Other Legal Information, published by Citi as a matter of public record, establishing that the address to which Plaintiff mailed the aforesaid letter was correct and accurate.

A plaintiff may oppose a motion to dismiss with additional facts asserted by affidavit if those facts are consistent with the allegations in the complaint. *U.S. v. Midwest Generation, LLC*, 781 F.Supp.2d 677, 683 (N.D. Ill. 2011). In deciding a motion to dismiss, a court may consider documents that a plaintiff knew about and relied upon in bringing suit, regardless if those documents are not mentioned in the complaint. *Bank of New York Mellon Trust Co. v. Morgan Stanley Mortg. Capital, Inc.*, 2011 WL 2610661 at *3 (S.D.N.Y. June 27, 2011). In ruling upon a 12(b)(6) motion, a court may take judicial notice of matters of public record without converting

the motion to dismiss into one for summary judgment. *Anderson v. Simon*, 217 F.3d 472, 474-75 (7th Cir. 2000).

Even if Plaintiff had failed to provide notice to Citi and an opportunity to cure, courts have acknowledged that notice-and-cure provisions do not extend to claims based on deceptive business practices. *Gerber v. First Horizon Home Loans Corp.*, 2006 WL 581082 at *3 (W.D. Wash. Mar. 8, 2006) (holding that a claim of deceptive business practices exists independent of any contract between the parties); *Beyer v. Countrywide Home Loans Servicing LP*, 2008 WL 1791506 at *3 (W.D. Wash. 2008) (*accord*); *Abercrombie v. Wells Fargo Bank, N.A.*, 417 F.Supp.2d 1006, 1007-09 (N.D. Ill. 2006) (holding that a borrower's noncompliance with a notice-and-cure requirement cannot excuse a lender's failure to comply with the Truth in Lending Act's disclosure requirements).

Plaintiff has alleged that Citi and its vendor Safeguard Properties Management, Inc. ("Safeguard") engaged in deceptive practices by conducting drive-by property inspections of Plaintiff's home each and every month, scheduled by an automatic process once Plaintiff had defaulted on her mortgage, taking place regardless of the condition of the property or the fact that Plaintiff, her husband and children were present and accounted for; affording no means of demonstrating that Citi's interest in the property was not at risk; conducted by merely *driving past* the residence along an adjoining road, hundreds of feet away; with each inspection fee added to the past-due principal and interest of the loan, making it ever more difficult to bring the loan current. (FAC ¶¶ 6-9, 10, 17-20, 28-30, 35, 38, 42, 65, 101). Such concerns are relevant to Plaintiff's claims under RICO, for breach of contract, violation of Consumer Fraud Act, and other matters. Such claims exist independently of the notice-and-cure requirement in Plaintiff's mortgage agreement.

## II.    Plaintiff Has Standing to Assert a RICO Claim.

Defendant argues (page 6) that Plaintiff lacks RICO standing because her complaint does not allege that Plaintiff paid any of the inspection fees assessed by Citi on her monthly mortgage statements. As shall be clarified, there are well-pled allegations, and reasonable inferences therefrom, that establish a concrete and actual injury to confer standing under RICO.

It is alleged that thousands of Citi borrowers have defaulted on an ancillary obligation under their mortgages and been consequently charged for drive-by property inspections every month. (FAC ¶¶ 16, 28, 29, 37, 53). The FAC alleges that in Plaintiff's case, Citi and Safeguard have ordered and carried out at least sixty drive-by inspections of her residence, during a period when her home was continuously occupied and maintained by Plaintiff and her loved ones, and that at least sixty inspection fees have been assessed, showing up on Plaintiff's monthly statements as charges for unspecified services. (FAC ¶¶ 35-36).

It is alleged that Citi implements a policy of adding any unpaid inspection fees to the borrowers' past-due principal and interest. (FAC ¶¶ 41-42). This is alleged to have occurred in Plaintiff's case in common with the members of her class. (FAC ¶¶ 36, 54, 55). If Plaintiff had paid any of the inspection fees, she would have suffered a monetary loss. If Plaintiff did not pay the inspection fees, she would incur additional indebtedness on her mortgage.

In *Vega v. Ocwen Fin. Corp.*, no. 14-cv-4408 (C.D. Cal.), the plaintiff brought a RICO claim alleging that the defendants had ordered property inspections and levied inspection fees against plaintiff and others in default, adding any unpaid fees to the borrowers' indebtedness. The defendants filed a motion to dismiss, arguing that Vega lacked standing under RICO for having not alleged any payment of the inspection fees. The court ruled that the assessment of allegedly invalid indebtedness was sufficient to meet the injury-in-fact requirement under RICO.

*Vega v. Ocwen Fin. Corp.*, no. 14-cv-4408 (Dkt. #50) (C.D. Cal. Dec. 1, 2014) (*"Vega I"*) at *10.[3] *See also Rubio v. Capital One Bank*, 613 F.3d 1195, 1204 (9th Cir. 2010) (allegedly unfair increase in annual percentage rate charged to credit card holder sufficient to create standing under state law requiring that plaintiff "must have suffered injury in fact").

Although Plaintiff did not allege which choice she accepted, she would have suffered an injury whether she paid the inspection fees or incurred additional indebtedness on her mortgage. In either case, Plaintiff would have suffered an injury sufficient to confer RICO standing.

### III. Plaintiff's Complaint Adequately Alleges a RICO enterprise.

Defendant argues that Plaintiff's RICO claim "suffers from the same flaws" as the allegations in *Stitt v. Citibank, N.A.,* 2015 WL 75237 (N.D. Cal. Jan. 6, 2015) (*"Stitt II"*), where it was held that plaintiffs did not adequately plead a RICO enterprise. Defendant states that Plaintiff "copied many of the allegations that *Stitt* found deficient," citing an allegation that refers to a "common purpose" of Citi and Safeguard.[4] Defendant states that Plaintiff's FAC is bereft of allegations showing that Safeguard shared a fraudulent purpose with Citi.

In point of fact, there are crucial differences between the Plaintiff's complaint and the RICO claim found inadequate in *Stitt*, which may help explicate the dismissal of the *Stitt* claim without leave to amend. In the FAC, it is alleged that Safeguard performed "unreasonable and impractical" off-site inspections, taking place in the time it takes for an inspector's vehicle to drive past the property." (FAC ¶¶ 6, 19, 28, 101). It is alleged that every default-related property inspection was performed by Safeguard in such a manner. (FAC, ¶¶ 35, 38, 101). It is alleged that after each drive-by inspection, Safeguard prepared a report containing rote and duplicative findings that bespoke the superficiality of the procedure. (FAC ¶10). It is alleged that *Safeguard*

---

[3] In compliance with FRCP 32.1(b), Plaintiff has attached the *Vega* court's December 1, 2014 order.
[4] Of the 124 allegations in the FAC, there are perhaps six or seven which bespeak inadvertent similarity to the *Stitt* complaint. Compare the fifty or sixty allegations in *Huyer* that materially echo and mirror Plaintiff's allegations.

*worked with Citi* to devise the procedures for these off-site 'property inspections' conducted in a minimum amount of time, intended to maximize the fees assessed on delinquent accounts. (FAC ¶¶ 28, 37, 46). It is alleged that Safeguard was aware that these drive-by inspections fell short of the inspections that it conducted on behalf of other lenders. (FAC ¶¶ 35, 36, 39, 40, 106(d)-(f)).

It was never alleged in *Stitt* that the inspections were regularly conducted from inside a moving vehicle, at a distance, lasting as long as it took to drive past the property or occasioning reports that were not to be relied upon. It was never alleged that Safeguard worked with Citi to devise these sham inspections. As the court observed in *Stitt II*, the plaintiffs "offered no factual allegations to render plausible their claim that the enterprise members actually knew of the alleged fraudulent common purpose." 2015 WL 75237 at *5. Rather, the plaintiffs offered allegations that demonstrated "only that Safeguard acted pursuant to a service contract" with Citi. *Id.* On such basis, the court found that the *Stitt* plaintiffs had failed to sufficiently allege that the members of the association-in-fact shared a common purpose.

In *Huyer*, by contrast, the plaintiffs alleged that they had been injured by being charged for default-related drive-by property inspections occurring every 20 to 45 days, with each inspection report uploaded into Wells Fargo's computer mainframe. (*Huyer* am. compl. ¶¶ 32, 39, 40, 48, 50, 60, 62, 115). The plaintiffs made clear that the inspections performed by Wells Fargo's vendors were unreasonable due to their being conducted from a moving vehicle, implicating the vendors' awareness that such inspections were ineffectual and disingenuous:

> The property inspections ordered by the Wells Fargo computer system are mere "drive-by" inspections, i.e., the inspector "drives by" the property ostensibly to assess whether the house is occupied, being maintained, and has not been damaged – a practice that provides little, if any, real opportunity to determine whether the lender's interest in the property is at risk.

(*Huyer* am. compl. ¶40).

If a borrower failed to perform the covenants and agreements in the security agreement, the *Huyer* mortgages similarly permitted Wells Fargo "to do and pay whatever is reasonable or appropriate to protect the Lender's interest in the Property."[5] (*Huyer* am. compl. ¶21).

The *Huyer* plaintiffs asserted that the frequency of the drive-by inspections and the cursory nature of such inspections made the property inspection fees unreasonable. The imposition of the inspection fees along with the imposition of late charges was part of a scheme to increase the borrowers' indebtedness.[6] *Huyer I*, 671 F.Supp.2d at 1024.

Pursuant to allegations of monthly property inspections ordered by Wells Fargo and carried out by its service vendors by merely driving past the properties, the court held that the plaintiffs had adequately pled that Wells Fargo had formed an association-in-fact RICO enterprise:

> Plaintiffs allege that Wells Fargo conducted the affairs of the enterprise by ordering the property inspections, used its association-in-fact business arrangement with the property inspection vendors to conduct its unlawful practice of imposing excessive fees on the mortgagors, and engaged in mail and wire fraud to collect payments for the enterprise's benefit. Accordingly, the Court concludes that the RICO enterprise as pleaded by the Plaintiffs satisfies the requirements of 18 U.S.C. § 1962(c).

*Id.* at 1028.

The allegations in the FAC are substantially similar to those in the *Huyer* complaint. The fact patterns of the two cases both feature the implementation of intrinsically ineffectual drive-by inspections by vendors working hand-in-hand with a mortgage company to maximize default-related service fees. There is ample basis for a finding that Plaintiff has adequately pled the existence of an association-in-fact enterprise.

---

[5] This is substantially similar, if not identical, to Paragraph 9 of the Plaintiff's mortgage.
[6] Wells Fargo was involved in a "cohesive" scheme involving both late charges and inspection fees. The late charges were not easily divisible from inspection fees when assessing the potentiality of fraud. 671 F.Supp.2d at 1027. It was only the inspection fees which were mentioned in the *Huyer II* decision certifying the class.

Defendant states (page 8) that Citi and Safeguard could not have shared a purpose to defraud borrowers, because Citi does not mark up the cost of property inspections performed by its service vendors.[7] Assuming that Citi derived no net gain from its association-in-fact with Safeguard, it is not necessary for a RICO complaint to allege that every defendant received a benefit from the enterprise. Rather, it must be shown that all defendants participated in the operation or management of the enterprise. *MCM Partners, Inc. v. Andrews-Bartlett & Assoc.*, 62 F.3d 967, 977 (7th Cir. 1995). The FAC contains numerous allegations showing that Citi played a paramount role in directing the affairs of the enterprise. (FAC ¶¶ 7-8, 17-19, 37-38).

In the absence of allegations that Citi made a profit off the inspection fees, there would still be a showing of benefits accruing to Citi. The FAC alleges that Citi maintained a practice of adding any unpaid inspection fees to the borrowers' past-due principal and interest, thereby increasing the amount of interest accruing during the next month. (FAC ¶¶ 41-42). If it is true that Citi did not mark up the inspection fees, Citi would nevertheless reap benefits from the thousands of dollars thus added to the balances of the mortgages over time – increasing the requisite payment to bring the accounts out of default, entailing a greater likelihood of obtaining title to the residences via foreclosure.

## IV.    Plaintiff's Complaint Adequately Alleges the Conduct of a RICO Enterprise.

Citing the holding in *Stitt II* that plaintiffs had failed to adequately allege a RICO enterprise, Defendant argues (Def. Mem. page 8) that Plaintiff could likewise not be found to have alleged any conduct befitting of a RICO enterprise. Plaintiff's complaint describes "regular business activities" showing that Citi and Safeguard had a "commercial relationship," but fails to show any enterprise activities separate and apart from what they normally did at work.

---

[7] Defendant supports this proposition by citing the factual findings of the *Stitt* court, assuming that this Court will be thus constrained to make similar findings. Plaintiff objects to such apparent assumption.

Defendant's aforesaid argument is mistaken. The FAC alleges that Safeguard and Citi joined together to create a distinct entity for the purpose of maximizing service fees charged to delinquent borrowers' accounts, increasing the probability that homes will be repossessed. (FAC ¶¶ 4-5, 61-64). Both participants are alleged to have engaged in activities directly related to the enterprise, separate and apart from regular business activities of a lender and service vendor, including programming Citi's loan management system to automatically order default-related property inspections, conducting the inspections while inside a moving vehicle, and concealing the drive-by nature of the inspections. (FAC ¶¶ 6, 10, 19, 28, 30, 35, 38, 65, 67-68). As the *Huyer* court found when appraising a similar RICO claim, such allegations show that the lender used an association-in-fact arrangement to conduct the unlawful practice of imposing fees upon delinquent borrowers for drive-by property inspections that could not have achieved any legitimate purpose. *Huyer I*, 671 F.Supp.2d at 1028. Having adequately alleged the existence of an association-in-fact enterprise, Plaintiff has also adequately alleged distinct enterprise conduct on the part of Citi and Safeguard.

**V.  The FAC Adequately Alleges Racketeering Activity**

> A.  The *Huyer* complaint adequately alleged a RICO scheme with substantially similar factual allegations.

The *Huyer* plaintiffs brought a claim against Wells Fargo for violation of the RICO statute, arising from an alleged fraudulent scheme to exact improper inspection fees from homeowners who had fallen into arrears on their mortgages. (*Huyer* am. compl. ¶1). Wells Fargo filed a motion to dismiss, arguing that such allegations amounted to a "mispleaded contract dispute." *Huyer I*, 671 F.Supp.2d at 1033.

The court found that, although the basis of the plaintiffs' relationship to Wells Fargo was established by contract, plaintiffs had alleged that Wells Fargo's practices constituted a

systematic scheme to charge excessive fees and conceal the nature of those fees on the monthly statements sent to the distressed borrowers. *Id.* at 1033-34. [8]

The *Huyer* court addressed the pattern of racketeering activity set forth in the complaint:

> Plaintiffs have pleaded that Wells Fargo engaged in a systematic course of conduct to defraud mortgage borrowers. Plaintiffs allege that Wells Fargo has managed and administered its mortgage servicing through the use of general computer software packages with little or no human intervention since at least 2001, and that the scheme was in existence when they obtained their mortgages. Compl. ¶¶ 3, 26, 37. Plaintiffs describe how they believe the excessive fees are calculated within the Fidelity MSP program. Id. ¶¶ 26-35. They lay forth the process by which the Fidelity MSP system automatically generates property inspection requests, sends them to property inspection vendors, allows the property inspection vendor to upload its report, and charges a property inspection fee to the mortgagor's mortgage account. Id. ¶¶ 29-33. They note that after the first property inspection is triggered by a default, the system will continue to generate property inspection orders every 20-45 days until the mortgagor cures the default. Id. ¶ 34. Plaintiffs also assert that the computer system was programmed to first pay all outstanding fees and costs before satisfying the interest and principal due, resulting in late fees after a missed payment, regardless of continued payment. Id. ¶¶ 3, 52-53, 64-65...

> Plaintiffs assert that the manner in which Wells Fargo ordered property inspections was not reasonable, and that sequential late fees charged for several months following a single missed payment violated specific terms of their mortgage agreements. Compl. ¶¶ 3, 52-53; 64-65. ...

> Plaintiffs have pleaded specific information regarding multiple monthly statements that charged Plaintiffs the allegedly excessive fees, including amounts and dates.

*Id.* at 1034-35.

The court ruled that the allegations describing the racketeering activity were pled with sufficient particularity under the RICO statute as well as under Rules 8 and 9(b). *Id.* at 1028, 1039-40. Wells Fargo's motion to dismiss was denied.

---

[8] Wells Fargo's software program never revealed that the fees were charged for property inspections conducted off site by having the inspector simply drive past the properties. This is what was "concealed" from the borrowers.

The FAC's allegations are strikingly similar to the allegations in *Huyer*. As in *Huyer*, a computer program automatically generated property inspection requests, sent them to property inspection vendors, allowed the vendor to upload its report, and charged a property inspection fee to the mortgagor's account. FAC ¶¶ 17, 19-21, 38. As in *Huyer*, after the first property inspection was triggered by the borrowers' default, Citi's system would continue to generate property inspection orders every few weeks until the mortgagor cured the default. FAC ¶¶ 6, 9, 38. As in *Huyer*, the computer system was programmed to first pay all outstanding inspection fees before satisfying the interest and principal due, resulting in late fees after a missed payment, regardless of continued payment. FAC ¶¶ 41-42. As in *Huyer*, the FAC alleges that Citi sent out the mortgage statements assessing the improper inspection fees by regular U.S. mail in furtherance of the scheme. FAC ¶¶ 69-70.

Plaintiff has likewise made specific allegations regarding the mortgage statements that she received which assessed drive-by inspection fees. The FAC alleges that Citi and Safeguard carried out sixty drive-by inspections of Plaintiff's residence over a five-year period, equating to one per month, and that a total of sixty inspection fees were charged by Citi, each one showing up on Plaintiff's mortgage statement without clarifying explanation. FAC ¶¶ 35-36.

On page 1 of its Memorandum, Defendant asserts that Citi's monthly default-related inspection fees averaged about $12-$15. Accepting such stipulation for the present purposes, it has been shown that Plaintiff was charged those inspection fees each and every month for five years, from 2011 through 2015.

Plaintiff's complaint alleges a pattern of racketeering activity strikingly similar to the racketeering activity alleged by the *Huyer* plaintiffs, whose complaint stated a claim under RICO. Plaintiff submits that her allegations also satisfy the pleading standard for a RICO claim.

B.  Plaintiff has adequately alleged a scheme to defraud involving fraudulent misrepresentation or fraudulent concealment.

Defendant cites case law (page 9) adjuring against 'transmogrifying' breach of contract actions into RICO claims by merely charging that the breach was fraudulent. Defendant proceeds to quote an observation made in *Stitt III*, i.e., that "[t]his is a classic breach of contract claim inappropriately repackaged as fraud." A "mere disagreement" regarding whether a property inspection was reasonable "does not create additional liability." (Def. Mem. page 10) Defendant argues that Plaintiff's RICO claim is likewise merely an action for breach of contract.

As mentioned, it was never alleged in *Stitt* that every property inspection was conducted from inside a moving vehicle located off-site, did not last longer than a matter of seconds, and occasioned inspection reports that were rote and duplicative of each other. It was never alleged in *Stitt* that Safeguard worked with Citi to devise these minimalist inspections.

It is well settled that allegations of deceptive business practices can support a claim for fraudulent misrepresentation or concealment, even when a defendant's actions are also contrary to the terms of a contract. *Huyer I*, 671 F.Supp.2d at 1034. *See also Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 526-27 (1983) (diversion of business to nonunion portion of 'double-breasted' operation might constitute breach of contract "or perhaps even common-law fraud or deceit"); *Am. Med. Ass'n v. United Healthcare Corp.,* 588 F.Supp.2d 432, 443 (S.D.N.Y. 2008) (plaintiffs sufficiently alleged false and fraudulent violation of RICO where complaint stated that healthcare provider made false representations regarding fees due under medical plans). *AB Mauri Food, Inc. v. Harold,* 2008 WL 878451, at *2 (E.D. Mo. Mar. 27, 2008) (finding that the plaintiffs had alleged "intentional, deliberate and planned concealment of the conduct," such that the allegations were differentiated from a mere breach, satisfied RICO predicate act requirement).

Defendant's deceptive business practice of assessing inspection fees for drive-by property inspections can thus support a RICO claim alleging fraudulent misrepresentation or fraudulent concealment. In either case, what has been fraudulently misrepresented or concealed is the fact that the property inspections were (a) conducted off premises, by driving past the property without ever getting out of the car; (b) conducted for a matter of seconds; (c) documented by inspection reports that were rote and duplicative of other clients' reports.

## VI.    The FAC states a claim for breach of contract.

Having previously argued that Plaintiff's RICO claim is in reality a contract claim, Defendant now argues that the FAC fails to state a contract claim. Defendant argues that the "specific authorization of property inspection fees" in Paragraph 14 of Plaintiff's mortgage contract, not Paragraph 9,[9] should control a consideration of whether Citi's inspection fees were reasonable. Defendant then refers to *Vega v. Ocwen Fin. Corp.*, 2015 WL 1383241 (C.D. Cal. Mar. 24, 2015) ("*Vega II*"), stating that *Vega II* held that the very same Paragraphs 9 and 14 "do not mandate a reasonableness determination" and that "inspection fees are *per se* reasonable," thus apparently ruling out the possibility of a breach-of-contract action. (Def. Mem. page 14).

Defendant has grossly misrepresented *Vega II*'s holding. The court in fact stated:

> [T]he terms of the mortgage agreement do not mandate a reasonableness determination before Ocwen can order a property inspection – the terms merely state that property inspections are reasonable and appropriate acts in the event of a default. *However, to read the mortgage agreement in light most favorable to Vega, the Court will assume that Ocwen can only assess property inspection fees when "reasonable."*

2015 WL 1383241 at *4; emphasis added.

---

[9] In Paragraph 9 of Plaintiff's mortgage, it is stated: "If Borrower fails to perform the covenants and agreements in the Security Instrument, Lender may do and pay for whatever is reasonable and appropriate to protect Lender's interest in the property." Paragraph 14 states: "Lender may charge Borrower for services in connection with Borrower's default, including but not limited to attorneys' fees, property inspections and valuation fees." FAC ¶24.

Moreover, nowhere in *Vega II* is it stated that "inspection fees are *per se* reasonable," either verbatim or using any other phraseology to such effect.

It is helpful to quote from the next part of that decision, where the court addressed the plaintiff's allegation that defendant had utilized an automated process to order the default-related property inspections:

> Is automated ordering of property inspections "reasonable" under the terms of the mortgage agreement? *Such a question is a breach of contract claim and nothing more.* A factfinder could reasonably conclude that the contractual terms are broad enough to authorize automated property inspections. A factfinder could also find that Ocwen breached the mortgage agreement by not acting reasonably when ordering the inspections automatically. ...
>
> According to Vega, "this case is about the manner" property inspections are ordered. *If that is true, Vega has alleged nothing more than a breach of contract claim.* Yet Vega is bringing a host of fraud and deception claims. The Court will not allow Vega to spin a simple contract dispute into something more. [10]

2015 WL 1383241 at *5-6; emphasis added.

Defendant's discussion of *Vega II*, in other words, misrepresents the holding by one hundred and eighty degrees. The question of whether fees for property inspections that were ordered automatically were unreasonable **lent substance to a breach of contract claim**. Had such a claim been filed, it would have been upheld. Vega had not made such a claim.

Unlike the complaint in *Vega II,* the FAC includes a claim for breach of contract. In making such claim, Plaintiff takes issue with the automated software used to schedule the default-related inspections. (FAC ¶¶ 7, 17-21). Had Plaintiff's complaint been before the *Vega* court, her contract claim would have been upheld. Defendant's case law in this portion of its argument has sowed the seeds of its own refutation.

---

[10] The *Vega* plaintiff brought claims for RICO violations, unjust enrichment, fraud, and violation of consumer protection statutes.

## VII. The FAC states claims for violation of the CFA and for common law fraud.

To state a claim for common-law or statutory fraud, Plaintiff must allege fraud "distinct from the alleged breach of a contractual promise." *Greenberger v. Geico Gen. Ins. Co.*, 631 F.3d 392, 400 (7th Cir. 2011). Defendant contends that this is beyond Plaintiff's reach, since Plaintiff's "theory that Citi implicitly misrepresented that her mortgage authorized the challenged fees" is merely a breach of contract claim. (Def. Mem. page 17).[11]

Defendant is mistaken. Plaintiff's common-law and statutory fraud claims, among others, are premised on the difference between a property inspection conducted *at close range and in person* and one that is an 'inspection' in name only. Plaintiff is saying that instead of actually inspecting her home on any occasion, i.e., by walking up to and around the property, Safeguard's inspectors merely drove *past* her residence at a distance, the process taking a matter of seconds, thereafter preparing inspection reports that made the same generic observations found in virtually every other default-related inspection report.

Such procedure was likewise carried out, by the same or similar Safeguard inspectors, for thousands of other properties in default on their Citi mortgages. In every case, the inspectors remained in their vehicles at all times, spent a minimum amount of time, if any time at all, in looking in the properties' direction, and prepared reports that contained few, if any, observations that were not borrowed from other reports.

Plaintiff is not alleging fraud arising from "the breach of a contractual promise" in the mortgage contract. The promise or covenant that was breached by Citi and Safeguard was not written out explicitly in the mortgage. It may be described as what would be necessary to ensure that *any* property inspection be taken seriously.

---

[11] Having just finished arguing that the complaint didn't state a breach of contract claim, Defendant now turns tail once again, and says that it does.

A bona fide property inspector does not remain cosseted in his vehicle, driving past the properties he is supposedly inspecting. A bona fide property inspector inspects the condition of properties by putting herself in close proximity to them. This requires getting out of one's vehicle and physically approaching the property. Such property inspections were never undertaken in *Huyer*, and they were never undertaken in this case.

Defendant argues (page 18) that a common-law fraud claim requires reliance, and because the complaint does not state that Plaintiff actually paid the inspection fees, she could not have relied upon Citi's "monthly statement in accepting charges and fees listed thereon." This objection was also made by the *Huyer* defendant, observing: "The Huyers have not established that they paid improper property inspection fees due to their own reliance on the purportedly false monthly statements on which they base their predicate offense claims." *Huyer II*, 295 F.R.D. at 340. The court found that the plaintiffs had suffered an injury-in-fact "regardless of whether they have actually paid some portion of the assessed property inspection fees or have been merely assessed, but are yet to pay, such fees." *Id.* at 341.[12] Although made in the context of Article III standing, such holding is equally relevant in this setting.

## VIII. Plaintiff's Class Allegations Satisfy Rule 23(a).

### 1. Commonality.

In discussing the possibility of meeting Rule 23(a)(2)'s "commonality" requirement, Defendant raises a couple of subjects that do not warrant anyone's attention. For one, Defendant implies (page 19) that some of Citi's mortgages may have imposed a "standard of necessity" rather than "reasonableness or appropriateness" regarding default-related inspection fees. Citi is well aware that its mortgage contracts have a total of two provisions with relevance to this issue:

---

[12] Plaintiff is aware that *Huyer II* made such ruling for the nominal benefit of other plaintiffs than the Huyers. It is believed that the right and intended beneficiaries included the Huyers.

Paragraph 9 and Paragraph 14. As their text makes clear, the only possible contractual standard for inspections referenced in the mortgage contract is one of reasonableness and appropriateness.

The word "unnecessary" in ¶8 of Plaintiff's amended complaint is an erroneous misprint, to be disregarded.

For another, Plaintiff denies that inapplicable HUD guidelines have any relevance to this case. Plaintiff did not rely upon HUD guidelines in bringing this cause of action. Plaintiff did not characterize her proposed remedies as HUD-related in her original or amended complaint.

"The standard that Plaintiff attempts to invoke in her class definitions thus could not apply to her mortgage, making Plaintiff both atypical and an inadequate representative of borrowers with HUD loans." (Def. Mem. pages 20-21).

Plaintiff does not describe herself as a HUD borrower, or as a representative of others in such category. Perhaps ill-advisedly, Plaintiff cited HUD guidelines in the FAC, utilizing such reference as a benchmark. Such guidelines were regarded as useful and reasonable even for a borrower who does not have an HUD-insured mortgage. Such guidelines can be disregarded without invalidating the operative portions of the FAC.

The *Huyer* case likewise did not involve mortgages that were FHA or HUD insured.[13] The *Huyer* plaintiffs' class definition was as follows:

> Plaintiffs allege that all members of the proposed class were injured in the same way, i.e., by being charged for drive-by property inspections ordered by Wells Fargo through its Fidelity software, without any prior determination that these inspections were necessary to protect the lender's interest in the respective property.

*Huyer II*, 295 F.R.D. at 337.

*Huyer II*'s class definition is equally applicable to this case. If one substitutes

---

[13] In the *Huyer* complaint, there was a similar reference to FHA guidelines as a general benchmark. (*Huyer* am. compl. ¶36).

CitiMortgage for Wells Fargo and deletes the word "Fidelity," such class definition would be perfectly appropriate.

The *Huyer* defendant maintained that whether any given property inspection was necessary could only be determined on a case-by-case basis, because the necessity of each inspection depended on individual borrowers' circumstances. *Id.* at 338. This is the same point Defendant makes on page 19 of its Memorandum, through the mouthpiece of *Stitt III*.[14] The *Huyer* court responded by citing *Ross v. RBS Citizens, N.A.,* 667 F.3d 900 (7th Cir. 2012), in which RBS had enforced an unofficial policy that denied certain employees overtime pay that was lawfully due. Although there might be slight variations in how RBS enforced its overtime policy, the class maintained a common claim. *Id.* at 909; *Huyer II,* 295 F.R.D. at 338.

*Accord, Foreman v. Heineman,* 240 F.R.D. 456, 503 (D. Neb. 2007) ("Where plaintiffs are challenging institutional policies and practices, the fact that each member of the class may be affected differently by the policies does not necessarily preclude a finding of commonality.")

The *Huyer* court did not disregard *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338 (2011). The court stated, "*Dukes* is inapplicable to and/or distinguishable from this case and does not preclude a conclusion that plaintiffs have shown commonality." *Huyer II,* 295 F.R.D. at 339.

Plaintiff has undertaken a similar process of resolution under Rule 23(a)(2). A class action has likewise raised the specter of drive-by property inspections conducted without a prior determination that such inspections were necessary to protect the lender's interest in the property. Such question of fact is common to the proposed class.

## 2. Typicality.

The requirement that the claims of the class representative be typical of the claims of the class is satisfied if there are members of the class who have the same or similar grievances as the

---

[14] I.e., "the validity of a property inspection charge is an individual inquiry."

plaintiff. *Jefferson v. Windy City Maintenance*, 1998 WL 474115 as *8 (N.D. Ill. Aug. 4, 1998) (holding that typicality existed where claims of named plaintiffs, as well as those of class members, arose from the same alleged discriminatory practices). Typicality is closely related to commonality and "a finding of one generally compels a finding of the other." *Buycks-Roberson v. Citibank Fed. Sav. Bank*, 162 F.R.D. 322, 333 n. 13 (N.D. Ill. 1995). Plaintiff's claims are typical of the class claims, and she will adequately represent her class.

**IX.    The Putative Class Allegations Satisfy Rule 23(b).**

Plaintiff seeks an award of damages and other relief, including injunctive and/or declaratory relief. Defendant contends that Plaintiff's request for injunctive relief cannot be certified under Rule 23(b)(2) due to a lack of "cohesive" interest on the part of the claimants. According to Defendant, Plaintiff's request for damages cannot be certified under Rule 23(b)(3), since Plaintiff cannot show that questions of law or fact common to class members predominate over questions affecting only individual members, that a class action is superior to other available methods for adjudicating the controversy, and that a single nationwide class is manageable. Plaintiff respectfully disagrees.

**A.    Rule 23(b)(2) cohesiveness.**

A class action is maintainable under Rule 23(b)(2) when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." The 'cohesiveness' requirement "precludes certification when individual issues abound." *Thompson v. American Tobacco Company, Inc.*, 189 F.R.D. 544, 557 (D. Minn. 1999). However, such requirement "is easily met in cases where, as in this case, the class members are subject to the very practice or policies of the defendant that is being challenged in the lawsuit." *Huyer II*, 295

F.R.D. at 345. *See Smith v. United HealthCare Servs., Inc.*, 2002 WL 192565 at \*5 (D. Minn. Feb. 5, 2002) (class certification appropriate where plaintiffs sought injunctive relief to remedy a course of conduct that was "generally applicable" to the proposed class.). "Some differences among the class members are expected within any injunctive class, but this alone does not defeat cohesiveness." *Huyer II*, 295 F.R.D. at 345; *see Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 897 (7th Cir. 1999) (discussing the use of Rule 23(b)(2) in employment discrimination case where differences between plaintiffs' situations could allow for differential damages). Cf. *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998) (observing that class certification under Rule 23(b)(2) is inappropriate if "*significant* individual issues... pervade the entire action" (emphasis added)).

Defendant claims that the putative classes are not cohesive because Citi's conduct cannot be evaluated without reference to individual circumstances of each plaintiff. (Def. Mem. page 22). Plaintiff does not accept this. It was a policy of ordering ineffective drive-by property inspections that created a Rule 23(b)(2) class in *Huyer*, where it was stated:

> All members of this class have been subjected to the same policy of ordering drive-by property inspections for borrowers meeting certain delinquency criteria. Indeed, it is undisputed that, during the period at issue in this lawsuit, Wells Fargo has applied this policy to all serviced mortgage loans. Unquestionably, the injunctive relief class members are not identically situated, but whatever the differences among them may be, they are neither "significant," nor "too many." *See Barnes*, 161 F.3d at 143. Accordingly, the Court concludes that the injunctive relief class is cohesive.

*Huyer II*, 295 F.R.D. at 346.

As in *Huyer*, the members of a proposed class have been subjected to a policy of ordering drive-by inspections every month, regardless of the condition of the home. In both cases, the ordering was done automatically. In either case, the class members may not be identically suited,

but whatever differences among them there might be, they are neither "significant" nor "too many."[15]

## B.    Rule 23(b)(3)'s predominance requirement.

Defendant seems confident that Plaintiff cannot satisfy the Rule 23(b)(3) predominance and superiority requirements, whereby class actions may proceed only when questions of fact and law common to class members predominate over questions affecting individual members, and a class action is shown to be superior to other available methods for resolving the controversy. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 616, 622 (1997). Even if there are class issues [satisfying the superiority requirement], Defendant believes the predominance criterion is far too demanding.

In point of fact, the U.S. District Court for the Southern District of Iowa ruled that the predominance requirement had been satisfied by the *Huyer* plaintiffs, granting a motion for class certification. Such events precipitated the settlement of the case in 2016.

The *Huyer* and *Michael* plaintiffs both alleged there were policies for ordering drive-by inspections of the homes of borrowers in default, regardless of the condition of the homes or their state of inhabitation, and for charging fees for each inspection, in violation of the RICO statute. Am. Compl. ¶¶ 6, 10, 19, 28, 30, 35, 38, 65, 67; *Huyer* am. compl. ¶¶ 21, 28-35, 37-38, 75-89; *Huyer II*, 295 F.R.D. at 347.

Where the question of whether a challenged policy constitutes a RICO violation can be determined by common evidence, there is no need to examine the individual circumstances of any class member. *Id.* at 348. *See Klay v. Humana, Inc.*, 382 F.3d 1241, 1257 (11th Cir. 2004) ("While corporate policies are only circumstantially relevant in discrimination or [breach-of-

---

[15] It should be remembered that the members of *Huyer*'s Rule 23(a) and Rule 23(b) class[es] were comprised of individuals repeatedly charged for drive-by property inspections.

contract] cases, they constitute the very heart of plaintiffs' RICO claims".)

Given the nature of the *Huyer* plaintiffs' allegations and causes of action, there was no need to prove whether any particular drive-by inspection was unreasonable. *Huyer II*, 295 F.R.D. at 348.

Given the nature of Plaintiff's allegations and causes of action, there is likewise no need to prove whether any particular drive-by inspection was unreasonable.

Plaintiff is likewise ready and able to satisfy the predominance requirement of Rule 23(b)(3). As in *Huyer*, questions of fact common to class members predominate over questions affecting individual members. As in *Huyer*, a class action is manifestly superior to other methods of resolving this controversy. As in *Huyer*, the Court has basis for a finding that the predominance requirement of Rule 23(b)(3) has been met.

### a. *Reasonableness of each individual inspection.*

As in *Huyer*, the Defendant's assertion that it is impossible to establish by evidence common to the whole class that each individual property inspection was unreasonable is, by itself, probably an accurate statement.[16] As in *Huyer*, what such assertion ignores is that Plaintiffs need not make such a showing to prevail on their claims in this lawsuit. The Plaintiff alleges that the challenged policy of ordering drive-by property inspections violates RICO, not that it breaches the mortgage note contracts between Plaintiffs and Citi. As in *Huyer*, there can be little doubt that whether the challenged policy constitutes a RICO violation can be established by common evidence and requires no examination of the individual circumstances of each class member. As in *Huyer*, given the nature of Plaintiffs' allegations and causes of action, there would be no need to prove whether any particular property inspection was unreasonable.

---

[16] *See Huyer II*, 295 F.R.D. at 348-49.

###### b.    *Reliance.*

A case entitled *In re U.S. Foodservice Pricing Litigation* held that a RICO claim's *reliance element* in a class action may be established by circumstantial evidence applicable to the class as a whole. If made relevant to this case, such evidence could consist of the payment of the amounts shown on the class members' mortgage statements, perhaps including property inspection fees; or the amounts of the fees standing alone; and/or the fee payments.

*Foodservice Pricing* was not binding on the *Huyer* court. However, *Huyer* found its logic persuasive and adopted its holding.

It should be remembered that the *Huyer* court had ruled that every possible plaintiff would have suffered an injury in the meaning of Article III, regardless of whether they had paid one or more of the inspection fees, or had not paid any of the fees.

*Foodservice Pricing*, in other words, pertained to the evidence for establishing financial losses sustained by a *class* of plaintiffs. In lieu of bringing in thousands of individuals to testify, Plaintiff can present circumstantial evidence pertaining to the payments of property inspection fees by a fractional proportion of the total members of the class. Upon establishing the amount of the payments, Plaintiff should be able to calculate a proposed settlement encompassing thousands of individuals.

## CONCLUSION

Plaintiff has undertaken to respond to Defendant's motion to dismiss by demonstrating the nature of her confidence and faith in the future resolution of this matter. In summary, Plaintiff believes that her claims are not tantamount to those asserted in the *Stitt* case, but are comparable to those asserted in *Huyer*.

Respectfully submitted,

/s/Anthony M. Klytta          .

Anthony M. Klytta
KLYTTA & KLYTTA
Attorneys for Plaintiff
1645 Birchwood
Des Plaines, Illinois 60016
Phone: (773) 727-2225